No. 12-56891

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

DANIEL ANDERSON,
*Plaintiff/Appellant*,

v.

HSBC BANK NEVADA, N.A.,
*Defendant/Appellee*.

_____

On Appeal From the United States District Court
for the Central District of California
The Honorable Dean D. Pregerson
District Court Case No. 2:09-cv-04271-DDP (Ex)

_____

**APPELLANT'S REPLY BRIEF**
_____

STRANGE & CARPENTER
Brian R. Strange (lacounsel@earthlink.net)
Gretchen Carpenter (gcarpenter@strangeandcarpenter.com)
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055 (telephone)
(310) 826-3210 (facsimile)

LAW OFFICES OF BARRY L. KRAMER
Barry L. Kramer (KramerLaw@aol.com)
12428 Promontory Road
Los Angeles, California 90049
Tel: (310) 440-9761

*Attorneys for Plaintiff/Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . ii

I.    INTRODUCTION . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . 2

    A.   HSBC Unilaterally Changed the Terms for the Use of
    the Credit Card . . . . . . . . 2

    B.   The Court Should Imply a Private Right of Action Under
    Section 97A.140(4)(b) . . . . . . 6

        1.   Section 97A.140(4)(b) Was Enacted To Benefit
        Cardholder Consumers . . . . . 8

        2.   The Legislative History Contains No Indication That
        The Statute Was Intended To Foreclose Private
        Rights Of Action . . . . . . 10

        3.   Implying A Private Right Of Action Is Consistent
        With The Underlying Purpose Of Section
        97A.140(4)(b) . . . . . . 10

    C.   Subparagraph (b) of Section 97A.140(4) is Not Preempted     15

III.  CONCLUSION . . . . . . . . 21

CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(A)(7)(C)
AND CIRCUIT RULE 32-1 . . . . . . 22

CERTIFICATE OF SERVICE . . . . . . . 23

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Chase Bank USA, N.A. v. McCoy*,
131 S. Ct. 871 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*McCoy v. Chase Manhattan Bank, USA*,
559 F.3d 963 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*McCoy v. Chase Manhattan Bank, USA, N.A.*,
654 F.3d 971 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Shaner v. Chase Bank USA, N.A.*,
587 F.3d 488 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Swanson v. Bank of America, N.A.*,
559 F.3d 653, *reh'g denied*, 563 F.3d 364 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . 3

## STATE CASES

*Baldonado v. Wynn Las Vegas LLC*,
194 P.3d 96 (Nev. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8, 14-15

*Banegas v. State Industrial Insurance System*,
19 P.3d 245 (Nev. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Metz v. Metz*,
101 P.3d 779 (Nev. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*U.S. Design & Const. Corp. v. International Brotherhood of Electric Workers*,
50 P.3d 170 (Nev. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8, 12

## FEDERAL STATUTE

12 U.S.C. § 85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATE STATUTES

Nev. Rev. Stat. § 97A.140(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nev. Rev. Stat. § 97A.140(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nev. Rev. Stat. § 97A.140(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

Nev. Rev. Stat. § 97A.140(4)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-9, 11

Nev. Rev. Stat. § 392C.010, art. IX (2011) . . . . . . . . . . . . . . . . . . . . . . . . . 10

Nev. Rev. Stat. § 608.180 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## FEDERAL RULES

12 C.F.R. § 7.4008(d)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. App. P. 31(a)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## OTHER

Merriam-Webster Dictionary,
http://www.merriam-webster.com/dictionary/avoid . . . . . . . . . . . . . . . . . . . . 17-18

Webster's New World Dictionary, 96 (2d Coll. ed. 1970). . . . . . . . . . . . . . . . . 17

# I.  <u>INTRODUCTION</u>

In its response brief, Defendant/Appellee HSBC Bank Nevada, N.A. ("HSBC") makes three arguments: first, that it did not unilaterally change the terms of Plaintiff Daniel Anderson's ("Plaintiff") credit card; second, that there is no private right of action under the Nevada statute that forms the basis for this appeal (Nev. Rev. Stat. § 97A.140(4)(b)); and third, that subparagraph 4(b) of Nev. Rev. Stat. § 97A.140 is preempted under federal law.  All of these arguments are misplaced for the reasons discussed below.

The facts of this case are not materially in question.  After the *end* of the billing cycle that ran from November 15 to December 14, 2007, HSBC sent Plaintiff a billing statement showing that HSBC had unilaterally increased Plaintiff's interest rate to the Default APR as of November 15, 2007 (the *start* of the billing cycle).  Subparagraph 4(b) of Nev. Rev. Stat. § 97A.140 (hereinafter, "Section 97A.140") requires that a cardholder be given the opportunity to avoid such a rate increase; and, most tellingly, HSBC does <u>not</u> attempt to argue that it complied with this requirement as written, because it cannot.  Instead, it argues that the provision is inapplicable, unenforceable, or invalid.  None of these arguments has merit, and the district court order dismissing this case should be reversed in full.

1

## II.   ARGUMENT

## A.   HSBC Unilaterally Changed the Terms for the Use of the Credit Card

Contrary to HSBC's argument, HSBC "unilaterally change[d] any term or condition for the use of a credit card," thereby directly implicating Section 97A.140(4)(b).  As an initial matter, it should be noted that HSBC is incorrect when it insinuates on page 19 of its brief that the Supreme Court would hold that HSBC's implementation of a default rate is not a "change in terms" but, rather, is the implementation of an "already-existing term."  In fact, in *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871 (2011), which involved federal Regulation Z, the Supreme Court expressly acknowledged the ambiguity of the Regulation, and therefore simply deferred to the Federal Reserve Board's interpretation of its own regulation.  Specifically, the Court acknowledged:

> In short, Regulation Z is unclear with respect to the crucial interpretive question: whether the interest-rate increase at issue in this case constitutes a 'change in terms' requiring notice.  We need not decide which party's interpretation is more persuasive, however; both are plausible, and the text alone does not permit a more definitive reading.  Accordingly, we find Regulation Z to be ambiguous as to the question presented....

2

131 S. Ct. at 880. Thus, the Supreme Court's decision in *Chase Bank* has no bearing on whether HSBC's implementation of a default rate was a "change in terms" for purposes of the Nevada statute.

In fact, it is important to note at this point that *Chase Bank*, *supra*, and the other cases cited by HSBC at pages 2 and 3 of its brief (*McCoy v. Chase Manhattan Bank, USA*, 559 F.3d 963 (9th Cir. 2009) ("*McCoy I*"); *McCoy v. Chase Manhattan Bank, USA, N.A.*, 654 F.3d 971, 975 (9th Cir. 2011) ("*McCoy II*"); *Swanson v. Bank of Am., N.A.*, 559 F.3d 653, *reh'g denied*, 563 F.3d 364 (7th Cir. 2009); and *Shaner v. Chase Bank USA, N.A.*, 587 F.3d 488 (1st Cir. 2009)), all related to the interpretation of the notice requirements of Federal Truth-in-Lending Act Regulation Z and provisions of Delaware law, none of which are at issue here. The banks in those cases were all domiciled in Delaware and subject to that state's banking laws. Here, by way of contrast, HSBC is based in Nevada and — uniquely for this case — the operative law of the bank's home state includes a substantive provision (Section 97A.140(4)(b)) that was not at issue in those other cases. Those cases did not consider the Nevada statute and so cannot be considered as persuasive, let alone binding, authority in interpreting it.

Furthermore, the cases HSBC relies upon all concerned the requirements

3

for a bank *to give advance notice* when increasing a cardholder's interest rate
— disclosure requirements that are not at issue on this appeal.  The issue here
is whether Nevada law confers a *substantive right* for a cardholder to reject the
rate increase and close his/her account without penalty, even if the bank was
not required to give advance notice of the increase.  This issue did not arise in
any of the preceding cases (as Nevada law was not involved) and so has not
been considered by any appellate court.

Starting on page 20 of its brief, HSBC argues that because it made no
change to the *written* terms and conditions of the credit card, as described in
Section 97A.140(2), but merely unilaterally elected to apply one of those terms,
there was no "unilateral change to any term or condition for the use of a credit
card" that could trigger Section 97A.140(4)(b).  This argument conveniently
ignores the intervening paragraph, Section 97A.140(3), which says, "The rate
of interest charged, and any other fees or charges imposed for the use of the
credit card, must be in an amount agreed upon by the issuer and cardholder."

It is clear from the order in which these paragraphs appear in the statute
that it contemplates that the credit card's interest rate (and its other fees and
charges) need not appear as part of the card's "written terms and conditions"
referenced in Section 97A.140(2), but merely need to be "agreed upon by the

4

issuer and the cardholder." This is indeed the case in practice, since the interest rates and other charges do not appear in the main body of the agreement but are set forth in a separate schedule and, as HSBC points out, they can and do vary in accordance with the federal Prime Rate and other factors. It is thus implausible for HSBC to argue that, because it changed the interest rate without changing the card's *written* terms and conditions, it did not "unilaterally change *any* term or condition for the use of a credit card" that would trigger Section 97A.140(4)(b). HSBC's brief at 21-22 (emphasis added).

Notably, HSBC's Default APR was not imposed *automatically*, as the agreement contemplated: "All your APRs may automatically increase up to the Default APR if you default . . . because you fail to make a payment to us when due . . . ." (ER 074). Arguably, an <u>automatic</u> increase, in accordance with the agreement's written terms, would not be a unilateral change by the issuer. But, in fact, this increase was *not* automatic. As HSBC points out on page 9 of its brief, the first time that Plaintiff failed to make his payment on time, HSBC did *not* increase his interest rate to the Default APR. But then, two months later, it *did* increase his rate when he missed a payment. This change "increased the costs to the cardholder for the use of the credit card," and thus is precisely the

5

kind of unilateral change, instigated by the issuer, against which Section 97A.140(4)(b) is intended to protect cardholders.  HSBC cannot evade the provisions of this statute by drafting its agreement in a way that lets it increase an interest rate unilaterally when it wants to, but deprives the consumer of the statutory right to reject the increase by closing the account.

HSBC's argument that the interest rate it charged is not a "term or condition for the use of a credit card" is meritless.  And, in any event, even if this were held to be the case, then the rate of interest charged would not have been "in an amount agreed upon by the issuer and cardholder," for clearly there could have been no meeting of the minds as to when Plaintiff's default rate would go into effect in the circumstances that arose in this case.

Accordingly, HSBC's argument that it did not make a unilateral change to the terms and conditions of Plaintiff's credit card account lacks merit and should be rejected.

## B.    The Court Should Imply a Private Right of Action Under Section 97A.140(4)(b)

HSBC goes to great length to persuade the Court that Section 97A.140(4)(b) does not authorize a private right of action for damages and that this Court should not imply such a right.  However, HSBC fails to cite a single

decision or piece of legislative history holding, or even implying, that Section 97A.140(4)(b) should not be the subject of a private right of action. Rather, HSBC glosses over the issue with generalities supported almost entirely by a single unrelated employment law case. *See* HSBC's brief at 25–33 (repeatedly citing *Baldonado v. Wynn Las Vegas LLC*, 194 P.3d 96, 101 (Nev. 2008)). HSBC's lack of persuasive case law or legislative history to support its contention that Section 97A.140(4)(b) includes absolutely no enforcement mechanism for injured consumers is telling. Indeed, and as discussed below, even applying HSBC's single case (*Baldonado*), the case for inferring a private right of action into Section 97A.140(4)(b) is equitable, appropriate, and well within the limits of applicable Nevada law.

Under Nevada law, statutory construction is an issue to be decided de novo as a matter of law. *See Metz v. Metz*, 101 P.3d 779, 783 (Nev. 2004). The objective when construing statutes is "to give effect to the legislature's intent." *U.S. Design & Const. Corp. v. Int'l Bhd. of Elec. Workers*, 50 P.3d 170, 172 (Nev. 2002). A court's statutory interpretation must "avoid absurd or unreasonable results." *Banegas v. State Indus. Ins. Sys.*, 19 P.3d 245, 249 (Nev. 2001). And "where the statutory language is ambiguous or otherwise unclear, the court will construe it according to that which 'reason and public

7

policy would indicate the legislature intended.'" *U.S. Design & Const. Corp.*, 50 P.3d at 172 (quoting *Nevada v. Vezeris*, 720 P.2d 1208, 1211 (1986)).

With the above parameters in mind, Nevada courts regularly imply private rights of action under the three-factor *Baldonado* test: (1) whether the statute was enacted to benefit persons in the plaintiff's position; (2) whether legislative history indicates any intention to create or deny a private remedy; and (3) whether implying such a remedy is consistent with the underlying purpose of the legislative scheme.

### 1. Section 97A.140(4)(b) Was Enacted To Benefit Cardholder Consumers

Under the first *Baldonado* factor, the operative inquiry is whether "the Legislature intended to confer a right on [consumers] as a class." *Baldonado*, 194 P.3d at 102 n.12. Section 97A.140(4)(b) was unquestionably enacted to benefit cardholder consumers, and HSBC effectively recognizes as much. *See* HSBC's brief, at 27 ("[T]here are some restrictions on lender conduct [within Chapter 97A] that surely favor cardholders . . . ."). And while HSBC argues that the bulk of Chapter 97A's regulations "focus[] almost entirely on the conduct of the issuer, not the customer," *id.*, basic logic requires that any legislation intended to protect consumers would primarily focus on the

8

behavior and activities of those in the position to take advantage of individual consumers, i.e., banks and lenders such as HSBC.  Thus, HSBC's arbitrary focus on the fact that Chapter 97A regulates credit card issuers actually demonstrates how the legislation was intended in large part to benefit cardholder consumers.

Additionally, the legislative history accompanying Senate Bill 516 (which was later codified as Chapter 97A), demonstrates the Nevada Legislature's intent to benefit cardholder consumers through the legislation. For example, while under consideration before the Senate Committee on the Judiciary, the following exchange occurred:

> Senator Adler asked for confirmation about [the portion of the proposed legislation requiring lenders to notify cardholders of any changes to the conditions of the use of the card]'s intent. . . .  Mr. Wittemore emphasized this provisions [sic] adds rights to the consumer that do not presently exist.[1]

Thus, documented evidence and basic logic indicate that Section 97A.140(4)(b) was enacted in large part to benefit cardholder consumers, and gives rise to an inference that the legislature intended to permit a private right of action.

---

[1] S. 68, Reg. Sess., at 11 (Nev. 1995), *available at* http://www.leg.state.nv.us/Division/Research/Library/LegHistory/LHs/1995/SB516,1995.pdf.

**2.      The Legislative History Contains No Indication That The Statute Was Intended To Foreclose Private Rights Of Action**

While the legislative history accompanying Section 97A.140 is largely silent on whether the legislature intended to permit private rights of action, it certainly does not indicate that the legislature intended to forbid the same. Indeed, where the Nevada Legislature intends to expressly disclaim a private right of action, it is fully capable of doing so.  *See, e.g.*, Nev. Rev. Stat. § 392C.010, art. IX (2011) ("Nothing in this section creates a private right of action . . . .").  Notably, no such language exists in Chapter 97A.  Rather, as set forth above, the legislative history demonstrates that Section 97A.140 was intended to protect consumers.  Accordingly, to read Section 97A.140 as providing absolutely no enforcement mechanism for injured consumers (private or otherwise) would be to read it in a manner incompatible with the statute's intent.

**3.      Implying A Private Right Of Action Is Consistent With The Underlying Purpose Of Section 97A.140(4)**

Implying a private right of action under Section 97A.140(4) is entirely consistent with the underlying purpose of the legislative scheme, as set forth above.  In its brief, HSBC incorrectly argues that Chapter 97A only provides private rights of action for card issuers and *not* for cardholders.  HSBC's brief

10

at 31.  In addition, HSBC contends, without any factual or legal basis, that Chapter 97A permits and requires cardholders to utilize "expert administrative agencies" to enforce the legislation's requirements.  *Id.*  On both counts HSBC is misguided and incorrect.

First, HSBC's argument that Chapter 97A provides card issuers with private rights of action against cardholders, while it simultaneously denies cardholders *any* recourse against the transgressions of card issuers, is illogical and without any factual or legal basis.  It is also inconsistent with the Nevada Legislature's intent to "adds [sic] rights to the consumer that do not presently exist [under Nevada law].").  *See* S. 68, *supra*, at 14.

Second, and against HSBC's misleading assertions to the contrary, Section 970A.140 contains no language whatsoever requiring cardholders to seek redress before "expert administrative agencies."[2]  While HSBC is correct that administrative agencies exist that accept complaints against national banks

---

[2] Countless other Nevada statutes demonstrate that the Nevada Legislature is fully capable and knowledgeable in the practice of expressly charging administrative officials with enforcing statutory schemes.  *See, e.g.*, Nev. Rev. Stat. § 608.180 ("The Labor Commissioner or his representative shall cause the provisions of NRS 608.005 to 608.195, inclusive, to be enforced . . . .").  However, in this instance, the Nevada Legislature included no such delegation of enforcement power.  Accordingly, such an omission can lead to only one logical conclusion — the Court should infer a private right of action to enforce Section 97A.140(4)(b)'s terms.

11

that issue credit cards, the existence of administrative agencies that accept complaints has never been held to be of any import in determining whether the legislature intended to provide a private right of action. Indeed, even when the legislation at issue *specifically* granted a right of enforcement to a government agency or official, such a grant of "a right of enforcement . . . does not preclude or explicitly exclude a private right of enforcement." *U.S. Design & Const. Corp.*, 50 P.3d at 172 (inferring a private right of action even where the plain language of the legislation granted a right of enforcement to the district attorney). Thus, HSBC's implication at page 32 of its brief that an administrative agency is "charged with superintending" Chapter 97A is not true.

Moreover, HSBC points to three "expert administrative agencies" which it claims are Nevada's "preferred enforcement mechanism[s]" for enforcing Section 97A.140 — (1) the "Nevada Department of Financial Institutions" (presumably referring to the Nevada Department of Business & Industry, Financial Institutions Division); (2) the Office of the Comptroller of the Currency; and (3) the Consumer Financial Protection Bureau. HSBC's brief at 31–32. But HSBC ignores the fact that there is no language in Chapter 97A, let alone Section 97A.140, referencing any of these so-called "preferred

12

enforcement mechanism[s]," much less charging them with responsibility for enforcing the statute's terms.

In addition, significantly, all three of HSBC's proffered "preferred enforcement mechanism[s]" lack the jurisdiction and ability to conclusively resolve a legal dispute between a cardholder and card issuer. The official Complaint Form provided by the Nevada Financial Institutions Division plainly states:

> In filing this complaint, I understand that the Financial Institutions Division cannot provide legal advice or legal representation, act as a mediator in any dispute or compel financial remedy or refund. In this regard, we suggest that you seek private counsel to protect your interests.

State of Nevada, Dept. of Bus. & Indus., Fin. Inst. Div., Complaint Form, *available at* http://www.fid.state.nv.us/Forms/FID-Complaint.pdf (last accessed July 30, 2013).

The Office of the Comptroller of the Currency's website similarly states, "*Please Note:* We cannot act as a court of law or as a lawyer on your behalf" (Office of the Comptroller of the Currency, Customer Complaint Form, *available at*

http://helpwithmybank.gov/complaints/form-pdf/complaint-form.pdf (last

13

accessed July 30, 2013)), and answers the question "What You Can Expect

From Us" upon the filing of a complaint with:

> • We will contact your financial institution, if it is a national bank or an operating subsidiary of a national bank, on your behalf for response.

> • We will send you a letter summarizing the results.

Office of the Comptroller of the Currency, *What You Can Expect From Us*,

*available at* http://helpwithmybank.gov/complaints/what-to-expect/complaints

-what-to- expect.html (last accessed July 30, 2013).

Finally, a cursory review of the Consumer Financial Protection Bureau's

website makes clear that the Bureau does not even enforce Nevada state

statutes: "Complaints help with our work to supervise companies, enforce

*federal* consumer financial laws, and write better rules and regulations."

Consumer Fin. Prot. Bureau, *Submit a Complaint*,

http://www.consumerfinance.gov/complaint/ (last accessed July 30, 2013)

(emphasis added).

In addition, HSBC fails to mention that *Baldonado*—the sole case HSBC

cites for its incorrect argument that there should be no private right of action to

enforce Section 97A.140 — involved a statute where the Legislature had

expressly created a specific administrative enforcement and remedy

14

mechanism. Importantly, Section 97A.140 contains no legislatively created administrative enforcement mechanism. The *Baldonado* court concluded:

> [I]n light of the statutory scheme requiring the Labor Commissioner to enforce the labor statutes and the availability of an adequate administrative remedy for those statutes' violations, the Legislature did not intend to create a parallel private remedy for NRS 608.160 violations.

*Baldonado*, 194 P.3d at 102. It is inconceivable that the Nevada Legislature, in enacting Section 97A.140, would have intended to create a statute without *any* mechanism for its enforcement.

In summary, HSBC can point to no case law interpreting Section 97A.140's enforcement mechanism, and its arguments that a private right of action should not be implied are meritless. Accordingly, this Court should follow legal and logical precedent and find a privately enforceable right of action in Section 97A.140.

## C.    Subparagraph (b) of Section 97A.140(4) is Not Preempted

Despite the fact that they are two separate subparagraphs, requiring two different things to be provided to a cardholder, HSBC attempts to conflate subparagraph 4(a) of Section 97A.140 with subparagraph 4(b), arguing at page 14 of its brief that because they are linked by the word "and," they must be "inextricably intertwined" as found by the district court. There is no support

for interpreting the statute in this manner; indeed, to show its falsity one need

look no further than paragraph 1 of Section 97A.140:

> 1.   An issuer located in this State shall not issue a credit card to a cardholder unless the issuer first:
>
> > (a)   Provides the written notice required pursuant to NRS 97A.145 to the cardholder; and
> >
> > (b)   Receives a written or oral request from the cardholder for the issuance of the credit card.

Just like paragraph 4, this paragraph contains two subparagraphs (a) and

(b), separated by a semicolon that is followed by the word "and." Yet these

subparagraphs relate to two separate and completely disjointed requirements:

an (arguably preempted) written notice requirement and a requirement that the

card must have been requested. The written notice *to* the cardholder, and the

written or oral request *from* the cardholder are two completely separate matters,

with neither being dependent upon the other. HSBC's claim that the

subparagraphs of this statute cannot contain freestanding requirements is

therefore without merit.

HSBC's next argument is that subparagraph 4(b)'s "opportunity to avoid

the change" (a substantive right) is necessarily dependent on subparagraph

4(a)'s thirty-day advance notice provision (a disclosure requirement). Since

disclosure requirements are federally preempted, HSBC argues, this preemption must also extend to the substantive right to avoid the change.  HSBC's reasoning appears to be that the change cannot be "avoided" once it goes into effect, and thus an issuer cannot provide the "opportunity to avoid" it without also having to give advance notice.  This argument might have had some appeal if the option to avoid the change had been dependent on the notice.  But, as argued in Appellant's Opening Brief, a consumer's right to reject the change and close his/her account voluntarily can be substantively satisfied by the issuer's refunding any increased charges when a cardholder chooses to exercise this right.  Therefore, it is not dependent upon advance notice being given and consequently not within the preemptive scope of the federal regulations.

Furthermore, HSBC's "Webster's Dictionary" argument does not support its position, since the primary meaning of the word "avoid" is "to make void; annul, invalidate or quash (a plea, etc., in law)."  *See* Webster's New World Dictionary 96 (2d Coll. ed. 1970).  The sense "to keep away from, evade, shun" is secondary, and "to keep from happening" is tertiary.  This order of priority is also preserved within the current online Merriam-Webster Dictionary:

> **Definition of AVOID**
> 1 **:** to make legally void **:** annul <*avoid* a plea>
> 2 *obsolete* **:** void, expel

17

      3  a **:** to keep away from **:** shun <have been *avoiding* me>
        b **:** to prevent the occurrence or effectiveness of <*avoid* further delays>
        c **:** to refrain from <*avoid* overeating>
      4  *archaic* **:** to depart or withdraw from **:** LEAVE

Merriam-Webster, *Avoid*, http://www.merriam-webster.com/dictionary/avoid

(last accessed July 30, 2013).  Clearly, therefore, a change can be "avoided" by

undoing it, and HSBC's attempt to draw a distinction between these concepts

fails.

      HSBC's final argument is that a state law which allowed customers to

reject an interest rate increase would impermissibly interfere with the bank's

federal lending powers under the National Bank Act ("NBA").  This argument

fails because section 85 of the Act (subject to certain exceptions not relevant

here) only permits a national banking association to "take, receive, reserve, and

charge on any loan . . . interest ***at the rate allowed by the laws of the State,***

***Territory, or District where the bank is located . . . and no more*** . . . ."  12

U.S.C. § 85 (emphasis added).  In other words, the NBA limits HSBC to

charging the interest rate permitted by Nevada laws, so it can hardly be said to

preempt a provision of those same laws regulating the interest a bank can

charge.  A Nevada statute that allows the cardholder to reject an interest rate

increase is clearly one that regulates the interest a bank may charge and, hence,

it is not preempted by the NBA.  On the contrary, it is embraced therein.

At page 40 of its brief, HSBC argues that upholding Plaintiff's position would result in contractual certainty being "thrown overboard in favor of wholly unpredictable *post-hoc* borrower discretion."  However, HSBC's position does not favor "contractual certainty"; instead, it seeks to preserve HSBC's wholly unpredicable *post-hoc* <u>lender</u> discretion!  The inconsistency in HSBC's position is blatant.

HSBC then argues that recalculating the interest rate for borrowers who wished to close their accounts would be "an undue burden that would overwhelm the bank's resources."  HSBC's brief at 40.  In other words, HSBC admits that so many of its cardholders are impacted by rate increases and wish to close their accounts that it lacks the resources to calculate the refunds they would be owed if it was forced to comply with the law.  This desperate argument should be rejected — if HSBC is unable to comply with the law, it should not be in the business of banking.

Next, HSBC argues that without the preempted subparagraph 4(a), subparagraph 4(b)'s "opportunity to avoid the change" becomes open-ended and thus somehow interferes with the bank's federal lending powers.  This interpretation makes no sense.  Even if the thirty-day notice provision is

disregarded as preempted, the statute would still only require a reasonable opportunity to avoid the change.  It is unlikely that any court would hold that a bank was required to extend this opportunity for more than thirty days.  In any case, banks would not be required to "continue lending to riskier borrowers indefinitely," since they always maintain the right to close any credit card account at will.  HSBC is simply setting up a straw man so as to knock it down again.

Finally, HSBC's arguments in regard to the OCC regulation, 12 C.F.R. § 7.4008(d)(4), which purportedly allows it to make loans without regard to state law limitations, are misplaced.  An administrative regulation cannot override the provisions of the NBA which limit interest charges to the amounts allowable under state law.  Accordingly, Plaintiff is not seeking to rewrite state law as HSBC asserts, but to enforce it.

### III.    <u>CONCLUSION</u>

HSBC's strained arguments merely underscore the merits of Plaintiff's appeal, as set forth in Appellant's Opening Brief and above.  The district court's order dismissing this case should be reversed in full.

Respectfully submitted,

Dated: August 2, 2013                     STRANGE & CARPENTER

By: <u>/s/ Gretchen Carpenter</u>
Gretchen Carpenter
gcarpenter@strangeandcarpenter.com
*Attorneys for Plaintiff/Appellant*

21

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(A)(7)(C) AND CIRCUIT RULE 32-1</u>

I certify that, pursuant to Fed. R. App. P. 31(a)(7)(C) and Ninth Circuit Rule 32-1, the attached brief is proportionately spaced, has a typeface of fourteen points or more, and contains 4,318 words.

Dated: August 2, 2013              STRANGE & CARPENTER

                                   By: <u>/s/ Gretchen Carpenter</u>
                                   Gretchen Carpenter
                                   gcarpenter@strangeandcarpenter.com

                                   *Attorneys for Plaintiff/Appellant*

22

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 2, 2013.

By: /s/ Gretchen Carpenter
Gretchen Carpenter

STRANGE & CARPENTER
12100 Wilshire Blvd., Ste. 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Fax: (310) 826-3210
gcarpenter@strangeandcarpenter.com